# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| JERRI JOETTE TILLETT, | CV 16-148-BLG-SPW-TJC |
| Plaintiff, | |
| vs. | **FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |
| BUREAU OF LAND MANAGEMENT, INTERIOR BOARD OF LAND APPEALS, and DEPARTMENT OF THE INTERIOR, | |
| Defendants. | |

Plaintiff Jerri Joette Tillett ("Tillett") brought this action seeking to stop alleged ongoing malfeasance by Defendants Bureau of Land Management ("BLM"), Interior Board of Land Appeals ("IBLA"), and Department of the Interior ("DOI") (collectively, "Defendants"), with respect to the Pryor Mountain Wild Horse Range ("PMWHR"). (*See generally* Doc. 1.) Pending before the Court are the parties' cross-motions for summary judgment.[1] (Docs. 25, 28.)

---

[1] Also pending is Defendants' Motion to Strike Plaintiff's Statement of Undisputed Facts (Doc. 34) ("Motion to Strike"), which argues that Tillett's Statement of Undisputed Facts (Doc. 30) is improper and should be stricken. Defendants certainly are correct that Tillett's statement fails to comply with D. Mont. L. R. 56.1(b). The Court also previously admonished Tillett regarding compliance with the Local Rules, and has advised her that the Court would be disinclined to consider future pleadings that did not substantially comply with the rules. (Doc. 17 at 5-6; *see also Tillett v. BLM, et al.,* CV 15-48-BLG-SPW-CSO (D. Mont. Feb. 2, 2016).) Nevertheless, the information provided in the Plaintiff's statement does

1

Having reviewed the parties' arguments and submissions, the Court makes the following findings and recommendations.

## I. Pertinent Facts

This lawsuit follows a 2014 lawsuit in this Court before U.S. District Judge Susan P. Watters in which Tillett challenged Defendant BLM's decision to conduct prescribed burns on certain sections of the PMWHR. *Tillett v. BLM, et al.*, CV 14-73-BLG-SPW (the "2014 litigation"). Tillett's claims in the 2014 litigation are similar – and in many cases identical – to the claims she has made here. (*See generally* Doc. 1.) Given the similarities between the two lawsuits, the Court will not reproduce here the factual background from the previous litigation, which is available in Judge Watters' Order and Opinion in that case. *See Tillett v. BLM, et al.*, CV 14-73-BLG-SPW (D. Mont. Aug. 28, 2015 (Doc. 35)).

Pertinent to this motion is that the 2014 litigation resulted in summary judgment in favor of Defendants, with the sole exception that BLM failed to comply with its National Environmental Policy Act ("NEPA") obligation to take a "hard look" at the impacts of the prescribed burns on sensitive species. (*Id*. at 18.) Specifically, Judge Watters found the "BLM complied with all but one of its NEPA obligations: the requirement to take a hard look when it considered the

---

not materially affect the Court's determination of the relevant issues. The Court therefore recommends that the Motion to Strike be denied as moot.

impacts of the prescribed burns on sensitive species in the area, in particular the Clark's Nutcracker." (*Id*.) The Court, therefore, remanded the matter to the BLM for further proceedings. (*Id.* at 19.)

In response to the Court's ruling, BLM revised and resubmitted the associated environmental assessment ("Revised EA") (Doc. 15 (Administrative Record at 975, *et seq*.)), and reissued its Finding of No Significant Impact ("FONSI") (*Id*. at 964, *et seq*.). The instant lawsuit is Tillett's challenge to the Revised EA. As the Court will discuss below, Tillett generally reargues the same issues she raised in the context of the 2014 litigation, including several issues that are clearly *res judicata*.

## II.    Parties' Arguments

Tillett raises numerous issues, and the Court will address each of her arguments in more specificity below. But for the sake of introduction, Tillett's claims are as follows: (1) the Revised EA fails to take the requisite hard look at the prescribed burns' effects on the Clark's Nutcracker, and instead improperly removes the Clark's Nutcracker from the list of sensitive species (Doc. 29 at 3-4); (2) BLM's decision to conduct prescribed burns within the PMWHR is in violation of the Migratory Bird Treaty Act ("MBTA"), Executive Order 13186, and the Bald

and Golden Eagle Protection Act ("BGEPA")[2]; (3) Tillett's First and Fifth Amendment rights have been violated with respect to the following: (i) her recent appeal before the Interior Board of Land Appeals ("IBLA"), (ii) BLM's failure to timely provide her with a Notice of Proposed Action ("NOPA"), (iii) BLM's "threat" to her and "malicious prosecution" of her in retaliation for whistle-blowing activity (*Id.* at 6-8); and (4) Defendants having "lied" about various things throughout this and prior litigation, including in pertinent part: (i) the presence of the plant Lesica's Bladderpod within the project area and (ii) the conservation status of the Clark's Nutcracker (*Id*. at 8-9). Though not addressed in her summary judgment briefing (Doc. 29), Tillett's complaint also challenges the Revised EA's treatment of other sensitive species in the area, including the Peregrine Falcon, several species of bat, and the plant Shoshone Carrot. (*See*, e.g., Doc. 37 at 7-8, 10-11.)

For a remedy, Tillett requests the following relief: (1) a "stay" on all active management of the PMWHR; (2) an "investigation," presumably of Defendants; and (3) $1.5 million, tax-free. (Doc. 1-1 at 24-25.)

---

[2] Tillett's original complaint also invoked "the Eagle Act." (Doc. 1-1 at 23.) As the Court explained in its January 30, 2017, Findings and Recommendation, all references to "the Eagle Act" the Court has been able to locate are shorthand references to the BGEPA. (Doc. 17 at 3, n. 3.) Tillett's summary judgment brief (Doc. 29) does not contain reference to "the Eagle Act," so the Court assumes Tillett is satisfied that the BGEPA and "Eagle Act" refer to the same legislation.

Defendants generally deny Tillett's claims, arguing that the Revised EA's treatment of sensitive species is satisfactory in all respects, and that Tillett's remaining claims are either baseless, unsupported by citation to legal authority, subject to prior adverse rulings, or some combination thereof. (*See generally* Docs. 26, 33.) The Court will discuss Defendants' specific arguments in more detail below as appropriate.

## III. Legal Standard

### A. Judicial Review under the APA

As discussed in the Court's January 30, 2017, Order, Tillett disputes the applicability of the Administrative Procedure Act ("APA"; 5 U.S.C. § 701, *et seq.* (2000)), and requests that the Court apply a different legal standard that is not as deferential to Defendants. (Doc. 18 at 2-5.) The Court previously determined that the issue of the applicable standard of review appropriately would be addressed in the merits briefing, and invited the parties to raise their arguments in their briefs on summary judgment. Tillett was advised, however, that if she "intend[ed] to argue again that the APA does not apply, she must advance specific legal arguments in favor of that proposition; merely repeating, however vociferously, that she would prefer the APA not apply will not suffice to persuade the Court." (*Id*. at 4-5.)

Tillett now claims that "[the Court] ordered this Plaintiff to comply with the APA formatt [sic] (against Plaintiff's strong objections)…" (Doc. 43 at 2.) Tillett

is plainly wrong.  The Court very clearly ordered that the applicability of the APA would be a subject of the merits briefing, noting explicitly that "[t]he parties may raise these arguments again in their principal briefs."  (Doc. 18 at 4.)  Tillett has failed to materially address the issue in her summary judgment briefing.  At no point does she present anything that could be construed as a "specific legal argument[] in favor of [the] proposition" that the APA should not apply in this case.  (*Id*. at 4-5.)

The Court therefore finds, as did Judge Watters in the 2014 litigation, that Tillett's principal claims should be construed as a challenge to a final agency action under the APA, and will proceed accordingly.  *See Tillett*, CV 14-73-BLG-SPW (D. Mont. Aug. 28, 2015 (Doc. 35 at 1, n. 1)).

In reviewing an agency action under the APA, the Court must determine whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 43 (1983).

Review under this standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. *Id.* Review is highly deferential to the agency's expertise, and presumes the agency action to be valid. *Arkansas v. Oklahoma,* 503 U.S. 91, 112 (1992). The agency, however, must articulate a rational connection between the relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *Id.*; *see also Midwater Trawlers Co-op v. Dep't of Commerce,* 282 F.3d 710, 716 (9th Cir. 2002). Thus, the court must look at whether the decision considered all of the relevant factors or whether the decision was a clear error of judgment. *Id.*

## B.     NEPA Standard of Review

NEPA is a procedural statute enacted to protect the environment by requiring government agencies to meet certain procedural safeguards before taking action affecting the environment. *See Cal. Ex. rel. Lockyer v. US. Dept. of Agric.,* 575 F.3d 999, 1012 (9th Cir. 2009). In other words, NEPA "force[s] agencies to publicly consider the environmental impacts of their actions before going forward." *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 963 (9th Cir. 2002).

NEPA requires an agency proposing a major federal action significantly impacting the environment to prepare an environmental impact statement ("EIS")

to analyze potential impacts and alternatives. 42 U.S.C. § 4332(C). To determine whether an EIS is required, the agency typically first prepares an EA. 40 C.F.R. § 1501.4(b). An EA is a "concise public document" that "include[s] brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. §§ 1508.9(a), (b); *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1239 (9th Cir. 2005).

Because NEPA does not contain a separate provision for judicial review, courts review an agency's compliance with NEPA under the APA, 5 U.S.C. §§ 701-706. 5 U.S.C. § 706(2)(A). Judicial review of administrative agency decisions under the APA is based on the administrative record compiled by the agency – not on independent fact-finding by the district court. *Camp v. Pitts,* 411 U.S. 138, 142 (1973).

A court's "review is limited to whether an EIS took a 'hard look' at the environmental impacts of a proposed action." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010). Once the court is "satisfied that a proposing agency has taken a hard look at a decision's environmental consequences, [its] review is at an end." *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir. 1992).

## C.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.*

The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the opposing party will have the burden of proof at trial, the moving party need only point to an absence of evidence to support the nonmoving party's case. *Id.* Courts may resolve APA challenges via summary judgment. *See Nw. Motorcycle Ass'n v. United States Dep't Agric.,* 18 F.3d 1468, 1472 (9th Cir. 1994).

## IV.  Discussion

It is necessary at the outset to discuss which of Tillett's numerous claims are properly before the Court. As discussed previously, this case follows the 2014

litigation, wherein Tillett challenged an earlier version of the same EA. The 2014 litigation resulted in Judge Watters' determination that "BLM complied with all but one of its NEPA obligations: the requirement to take a hard look when it considered the impacts of the prescribed burns on sensitive species in the area, in particular the Clark's Nutcracker." *Tillett*, CV 14-73-BLG-SPW (D. Mont. Aug. 28, 2015 (Doc. 35 at 18)). The Court, therefore, granted the BLM's motion for summary judgment with respect to all claims raised in that case with the exception of the special status species issue. With respect to that issue, the Court vacated the BLM's decisions regarding the impacts on special status species in the EA, and remanded the matter to the BLM for further proceedings. *Id*. at 18-19.

With respect to all other issues raised and determined in the 2014 litigation, the Defendants assert that *res judicata* bars their reconsideration. "An action is barred under res judicata where (1) the prior litigation involved the same parties or their privies, (2) the prior litigation was terminated by a final judgment on the merits, and (3) the prior litigation involved the same 'claim' or 'cause of action' as the later suit." *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 888 (9th Cir. 2000). "The doctrine of *res judicata* includes two distinct types of preclusion, claim preclusion and issue preclusion….The doctrine of issue preclusion prevents relitigation of all issues of fact or law that were actually litigated and necessarily

decided in a prior proceeding." *Robi v. Five Platters, Inc.*, 838 F.2d 318, 321-322 (9th Cir. 1988) (quotations omitted).

With the sole exception of Defendants' "decision regarding the impacts on special status species," all other issues the Court considered and decided within the context of the 2014 litigation have been finally determined and cannot be raised again in this action. Therefore, the Court will not address the following issues which were determined in the 2014 final judgment: (1) whether BLM provided adequate notice and allowed sufficient opportunity for public comment (*Tillett*, CV 14-73-BLG-SPW (D. Mont. Aug. 28, 2015 (Doc. 35 at 8-10))); (2) soil erosion and pesticide use within the burn area (*Id*. at 15); and (3) the prescribed burns' potential effects on wilderness study areas and the overall wilderness characteristics of the PMWHR (*Id*. at 16-18). If Tillett believes the precursor case wrongly decided these issues, her remedy was to appeal that decision to the Ninth Circuit Court of Appeals. This is not the proper forum to relitigate those issues.

In addition, the Court also declines to address Tillett's claim regarding the denial of her recent request for a stay of the proposed prescribed burn before the IBLA. (*See* Docs. 29 at 6-7, 33 at 10-11, 33-1; *Jerri Tillett*, 188 IBLA 384 (Dept. Int., Bd. Land. App. 2016).) IBLA's denial of Tillett's request for a stay did not occur until October 6, 2016, and therefore cannot be the final agency decision from which this appeal proceeds, as the filing of this case predates that decision.

Moreover, the only decision this Court possibly could review is IBLA's decision not to stay the prescribed burns, which issue this Court foreclosed when it denied Tillett's request for a preliminary injunction. (*See* Docs. 17, 32.) In addition, the IBLA has suspended the appeal pending resolution of this case. (Doc. 33-1.)

The Court also will not address Tillett's claim of a "malicious prosecution" at the hands of defendant BLM. (*See*, e.g., Doc. 29 at 8.) This claim, even if valid, has nothing whatsoever to do with Defendants' proposal to conduct prescribed burns on the PMWHR, and therefore has no relevance to the pertinent issues in this administrative appeal. Additionally, to the extent Tillett intends to assert an independent tort claim for a "malicious prosecution," she would have to bring that claim pursuant to the Federal Tort Claims Act (28 U.S.C. § 2401) ("FTCA"). In order to do so, the FTCA requires, *inter alia*, that she file an administrative tort claim with BLM as a jurisdictional prerequisite to filing suit in federal court against the United States. *Jerves v. United States*, 966 F.2d 517, 518-519 (9th Cir. 1992). Tillett has not alleged or presented any evidence or argument that she has satisfied this jurisdictional requirement.

After eliminating the foregoing issues, and construing Tillett's pleadings and other submissions liberally, the Court has identified the following issues that are properly before it:

(A)     Constitutional claims and claims for restitution and investigation;

(B)     Statutory claims under the MBTA, BGEPA, and Executive Order 13186; and

(C)     The Revised EA's treatment of special status species.

The Court will address these in turn.

## A.     Constitutional Claims, Restitution, and Investigation

Tillett peppers her various pleadings with non-specific claims that Defendants have violated her rights under the First and Fifth Amendments. Notwithstanding her blanket declarations that these rights have been violated, Tillett does not present any legal argument in support of these claims. Similarly, she does not explain the legal basis for either her request for monetary restitution or to the investigation she asks the Court to order. (*See* Doc. 1-1 at 24-25.) Regardless, the Court concludes that it lacks subject matter jurisdiction to entertain Tillett's constitutional claims, or to order restitution or an investigation.

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *Jachetta v. U.S.*, 653 F.3d 989, 903 (9th Cir. 2011). Waiver of sovereign immunity cannot be implied, but "must be unequivocally expressed in statutory text." *Id*. Absent waiver, sovereign immunity shields the United States and its agencies from suit. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). Tillett, as plaintiff, bears the burden of establishing subject matter jurisdiction with respect to her claims. *Kokkonen v.*

*Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  As discussed below, the APA provides a limited waiver of Defendants' sovereign immunity with respect to Tillett's administrative appeal, but that waiver does not extend to her other claims.

The United States has not waived sovereign immunity for actions seeking damages against the United States or its agencies for constitutional violations.  *See FDIC v. Meyer*, 510 U.S. at 475, 486 (1994).  Therefore, Tillett's claims under the First and Fifth Amendments must be dismissed.  *McMillan v. Dept. of Interior*, 907 F.Supp. 322, 327 (D. Nev. 1995) (citing *Rivera v. U.S.*, 924 F.2d 948, 951 (9th Cir. 1991) ("Plaintiff also alleges several claims arising from alleged violations of constitutional rights.  However, the United States has not waived sovereign immunity with respect to such claims."); *see also Holloman v. Watt*, 708 F.2d 1399, 1401-1402 (9th Cir. 1983) (sovereign immunity not waived for claim under the Constitution for damages against the U.S.); *Armsberg v. U.S.*, 757 F.2d 971, 980 (9th Cir.).

Similarly, the APA does not provide a waiver of sovereign immunity for money damages claims, so the Court lacks subject matter jurisdiction over Tillett's claim for restitution from Defendants.  *See Tucson Airport Authority v. General Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998).

Finally, the Court reaches the same conclusion with respect to Tillett's request for an investigation.  Defendants have not waived sovereign immunity for

actions seeking an independent investigation as a remedy. *See U.S. v. Edmondson*, 792 F.2d 1492, 1497 (9th Cir. 1986) ("The Executive Branch has exclusive and absolute discretion to decide whether to prosecute."); *see also Tillett v. Bureau of Land Management*, 2017 WL 3531440 (9th Cir. Aug. 17, 2017).

For the foregoing reasons, the Court recommends that Defendants' summary judgment motion (Doc. 25) be granted, and Tillett's summary judgment motion (Doc. 28) be denied, with respect to Tillett's constitutional claims and her claims for restitution and an investigation.

## B. MBTA, BGEPA, and Executive Order 13186

### i. MBTA

Tillett invokes the MBTA, as she did in the 2014 litigation, ostensibly to seek that statute's protections of migratory birds. Beyond invoking and quoting liberally from the MBTA statute, Tillett presents no legal argument as to what effect the MBTA should have on this case, or as to her authority to bring a claim thereunder. (*See*, e.g., Doc. 29 at 4-5.)

The MBTA is a criminal statute which is administered by the U.S. Fish and Wildlife Service ("FWS") – and not the Defendants. *Protect our Communities Foundation v. Jewell*, 825 F.3d 571, 585 (9th Cir. 2016). The MBTA prohibits "at any time, by any means or in any manner, to pursue, hunt, take, capture [or] kill…any migratory bird,…nest, or egg of any such bird" in the absence of a

permit or other exemption. 16 U.S.C. § 703(a). While it may be possible to bring a civil suit under the APA to compel the FWS's compliance with the statute (*see Protect Our Communities Foundation*, 825 F.3d at 585), the MBTA has no application to the Defendants' activities in this case.

The Ninth Circuit Court of Appeals has "explained that the definition of an unlawful 'taking' under the MBTA describes physical conduct of the sort engaged in by hunters and poachers" and does not contemplate mortality to birds that "occur[s] through 'habitat destruction,' even that which 'le[d] indirectly to bird deaths.'" *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1225 (9th Cir. 2004) (quoting *Seattle Audubon Society v. Evans*, 952 F.2d 297, 302-303 (9th Cir. 1991)). Tillett has not alleged – much less provided any evidence suggesting – that Defendants plan to hunt or poach any migratory birds; rather, her complaint is only that the prescribed burns may result in incidental mortality to individual birds and may otherwise damage migratory bird habitat. While unfortunate if true, that simply is not the sort of harm contemplated by the MBTA.

For the foregoing reasons, the Court recommends that Defendants' summary judgment motion (Doc. 25) be granted and Tillett's summary judgment motion (Doc. 28) be denied with respect to Tillett's claim under the MBTA.

### ii. BGEPA

The BGEPA provides that, absent a permit or other exemption, it is unlawful

to "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport,

export or import, at any time or in any manner, any bald eagle, commonly known

as the American eagle, or any golden eagle, alive or dead, or any part, nest, or egg

thereof." 16 U.S.C. § 668(b). Under the BGEPA, Federal agencies like BLM

"must obtain permits for take that would result from agency actions that are

implemented by the agency itself (including staff and contractors responsible for

carrying out those actions on behalf of the agency)." Eagle Permits; Take

Necessary to Protect Interests in Particular Localities, 74 Fed. Reg. 46,836 (Sept.

11, 2009).

By its plain terms, the BGEPA applies only to Bald and Golden Eagles. 16

U.S.C. § 668(b). BLM has not identified any Bald or Golden Eagles (collectively,

"Eagles") within the project area. Tillett concedes that BLM does not recognize

Eagles within the project area, but disputes the Eagles' absence. She claims that

"[o]ne of the (state) presidents of the Audubon Society acknowledged/confirmed

that he personally knew of the Eagles [sic] presence on the PMWHR (to me in a

direct conversation with me last Fall; 2016)." (Doc. 37 at 7.)

Tillett's second-hand, unsworn, and uncorroborated anecdote about the

potential presence of Eagles is not sufficient to create a genuine issue of material

fact. *Taylor*, 880 F.2d at 1045. Defendants are under no obligation to seek a permit for incidental taking of Eagles when there are no Eagles in the project area. *See* 50 C.F.R. § 22.26. Tillett has presented no actual evidence suggesting that Eagles are found within the project area. Absent such evidence, the Court cannot fault Defendants for failing to seek a permit under the BGEPA.

The Court therefore recommends that Defendants' summary judgment motion (Doc. 25) be granted and Tillett's summary judgment motion (Doc. 28) be denied with respect to Tillett's claim under the BGEPA.

### iii. Executive Order 13186

Tillett spends considerable time throughout her various pleadings contending that Defendants are in violation of Executive Order 13186 ("13186"), the purpose of which is to direct federal agencies to take various acts in furtherance of the implementation of the MBTA. 66 FR 3853. Despite her repeated invocations of 13186, Tillett does not explain what authority she may have to seek its enforcement, or what authority the Court may have to order Defendants to comply therewith.

The Court finds that neither Tillett nor the Court have any such authority, as 13186 provides explicitly:

> This order is intended only to improve the internal management of the executive branch and does not create any right or benefit, substantive or procedural, separately enforceable at law or equity by a party against

the United States, its agencies or instrumentalities, its officers or employees, or any other person.

*Id*. at § 5(b); *see also Defenders of Wildlife v. Jackson*, 791 F.Supp.2d 96, 120-121 (D. D.C. 2011) (holding that "Plaintiffs cannot use the review provisions of the APA to enforce" 13186 because it "is not subject to judicial review").

The Court therefore recommends that Defendants' summary judgment motion (Doc. 25) be granted and Tillett's summary judgment motion (Doc. 28) be denied with respect to Tillett's claim under 13186.

### C.     Revised EA's Treatment of Special Status Species

Tillett alleges, as she did in the 2014 litigation, that the Revised EA fails to take the requisite "hard look" at the prescribed burns' effects on special status species in the area.  As explained above, Judge Watters previously vacated and remanded BLM's decisions regarding special status species in the original EA, ruling that BLM had failed to take the requisite "hard look," particularly with respect to the Clark's Nutcracker.  *Tillett*, CV 14-73-BLG-SPW (D. Mont. Aug. 28, 2015 (Doc. 35 at 18-19)).

A "hard look" under NEPA requires consideration of all foreseeable direct and indirect impacts.  *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).  A hard look should involve a discussion of adverse impacts that does not improperly minimize negative side effects.  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1241 (9th Cir. 2005).  "General

statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Conservation Cong. v. Finely*, 774 F.3d 611, 621 (9th Cir. 2014). NEPA requires agencies to ensure professional and scientific integrity by setting forth the methodologies used and making "explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1160 (9th Cir. 2006).[3]

### i.     Clark's Nutcracker

The original EA identified the Clark's Nutcracker (the "Nutcracker") as a sensitive species, and Judge Watters found the BLM failed to take the requisite hard look at the prescribed burns' effects on the Nutcracker. Defendants now represent that the Nutcracker is not a sensitive species after all, and that its inclusion as a sensitive species in the original EA was a mistake. (Doc. 26 at 11.) Tillett interprets this development as further evidence of Defendants' malfeasance,

---

[3] Although NEPA regulations impose this requirement explicitly on an EIS, Judge Watters, like many other courts, found that it applies to the final EA here. *Tillett*, CV 14-73-BLG-SPW (D. Mont. Aug. 28, 2015 (Doc. 35 at 14). *See also Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1019 (9th Cir. 2012) (where defendants did not dispute that this requirement applied to the EA, court considered whether it had been met); *see also W. Watersheds Project v. Bureau of Land Mgmt.*, 971 F.Supp.2d 957, 974 (E.D. Cal. 2013), appeal dismissed (July 21, 2014) (BLM is required to set forth the methodologies it uses and references it relies upon for conclusions it makes in the final EA).

and insists that the Nutcracker is a sensitive species, regardless of what Defendants now claim.

Nevertheless, Tillett does not present any admissible evidence to demonstrate that the Nutcracker actually is designated as a sensitive species. While she does present some "scientific research" indicating, in her words, that the Nutcracker is "severely imperiled" (*see*, e.g., Docs. 1-1 at 12 and 1-2 at 38-45), BLM's decision as to the Nutcracker's status as a sensitive species is not at issue in this case. Tillett's "scientific research" may or may not have been persuasive if she had appealed the final agency decision in which the BLM determined whether the Nutcracker is or is not a sensitive species, but that decision is not before this Court; the decision Tillett is appealing here is the decision to conduct prescribed burns on the PMWHR.

Whether Tillett believes the Nutcracker should be on the list of sensitive species is immaterial to whether the Nutcracker actually is on the list, and Tillett has presented no evidence of the falsity of Defendants' representation that the Nutcracker is not currently designated as a sensitive species. The only evidence in the record on this point is the list of sensitive species appended to the Revised EA; that list does not include the Nutcracker. (AR at 1037-1038.)

Since the Nutcracker is not designated as a sensitive species, Defendants are not obligated to consider the prescribed burns' effects on the Nutcracker beyond

the attention given to all migratory birds, which Judge Watters has already affirmed. Nevertheless, in effort to comply with Judge Watters' order, Defendants treated the Nutcracker as a sensitive species for the purposes of the Revised EA. (AR at 1053, 1095-1105.)

Defendants noted the potential for relocation and individual mortality of the Nutcracker and described those possibilities as "limited" and "occasional," respectively. (AR at 1053.) Defendants discussed the effects of the prescribed burns on the Nutcracker's food supply, behavior, and habitat, and determined that the burns ultimately are likely to be beneficial to the Nutcracker. (*Id*.) Finally, Defendants cited and included scientific sources for their conclusions. (*Id*.; *see also* AR at 1095-1105.)

The Court finds that BLM took the requisite hard look at the prescribed burns' effects on the Nutcracker, even though it was not obligated to do so.

### ii. Bats

The project area contains four sensitive species of bat: Hoary, Pallid, Spotted, and Townsend's Big Eared (collectively, "Bats"). (AR at 1020.) The Revised EA contains a new section addressing the prescribed burns' effects on the Bats, differentiating between the individual species where appropriate. (*Id*. at 1022.) While the Revised EA indicates that research surrounding the effects of prescribed fires on these Bats is limited, the Revised EA details the likely effects

on the Bats' food sources and habitats, with specific emphasis on the Bats' various roosting habits. BLM concluded that, "[g]iven the limited amount of habitat that would be altered in any given year, the relative abundance of similar habitat located adjacent to the project area and the roosting preferences of the species present," the disturbance to the Bats is likely to be minimal, citing scientific sources for this conclusion. (*Id*.)

The Court finds that BLM took the requisite hard look at the prescribed burns' effects on the Hoary, Townsend's Big Eared, Pallid, and Spotted Bats.

### iii. Peregrine Falcon

BLM has identified a Peregrine Falcon (the "Falcon") aerie located outside the project area. (AR at 1020.) BLM biologists have monitored the aerie for numerous years, and it is known to be active annually. *Id.* The Revised EA concludes that "[t]here will be no direct impacts to the Peregrine Falcon aerie (other than slight disruption from an increased human presence) as it is not located within the project area. Long term impacts would be slightly beneficial due to improved foraging habitat within the project area." (AR at 1022.) Those two sentences are the extent of the Revised EA's discussion of the Falcon.

As indicated above, "[a] 'hard look' requires consideration of all foreseeable direct and indirect impacts." *Idaho Sporting Congress*, 305 F.3d at 973. The Revised EA identifies one "direct impact" – "a slight disruption from an increased

human presence" – but fails to discuss what effects, if any, that disruption may have on the Falcon, and does not propose any solution to minimize those effects.

The Revised EA further fails entirely to discuss any indirect impacts the prescribed burns may have on the Falcon. While the Court has no reason to doubt that the aerie is located outside the project area as Defendants represent, the Revised EA does not contain any information as to how far the aerie is from the potential burn area,[4] or how significant the project area is to the Falcon's well-being. The Court presumes, for example, that the Falcon utilizes the project area at least for foraging, given the Revised EA's prediction that "[l]ong term impacts would be slightly beneficial due to improved foraging habitat *within the project area*." (AR at 1022 (emphasis added).) Furthermore, the Revised EA is silent as to the prescribed burns' short-term impacts on the Falcon; if, for instance, a substantial amount of the resident Falcons' foraging activity occurs within the project area, those short-term effects could be significant, even if the Falcons retreat outside the project area to nest.

Ultimately, the fact that the known aerie technically is not located within the project area is an impermissibly arbitrary reason to forego further discussion of the

---

[4] Counsel for the United States advised the Court during a hearing on the present motions that the aerie is located approximately one-fourth of a mile from the proposed burn, but that information is not contained within the Revised EA, nor is there any discussion on why a burn within 440 yards of the aerie will have no impact on the Falcon or its nest.

prescribed burns' foreseeable impact on the Falcon. The Falcon is not a stationary creature, and the fact that it may nest at the outside perimeter of the burn area does not provide any information or analysis on the impact of its activities within the burn area.

Additionally, the Revised EA fails to support its conclusions with citation to any scientific sources. *Earth Island Inst.*, 442 F.3d at 1160.

Therefore, unlike the Revised EA's analysis of potential impact of the project on the Nutcracker and the Bats, the the Court finds that BLM has failed to take the requisite hard look at the prescribed burns' effects on the Peregrine Falcon.

### iv. Lesica's Bladderpod

As Judge Watters explained in her order in the 2014 litigation, "[b]ecause Lesica's Bladderpod is not found within the prescribed burn area, the Court need delve no further on that issue." *Tillett*, CV 14-73-BLG-SPW (D. Mont. Aug. 28, 2015 (Doc. 35 at 12). Nothing in the Revised EA alters that conclusion.

Tillett takes issue with this conclusion, and maintains the Revised EA contains contradictory conclusions that both (a) indicate that Lesica's Bladderpod (the "Bladderpod") is a sensitive species located within the project area and (b) exclude the Bladderpod from the prescribed burn area. (Doc. 29 at 8.) The Court finds no contradiction in these representations. The Revised EA clearly explains

that the Bladderpod population within Burn Unit 21 is in a far corner of the unit

and "not in an area where fire would readily be used," meaning the Bladderpod can

be both (a) within the project area and (b) not imperiled by the prescribed burns.

(AR at 1017.)  Tillett has provided no evidence to dispute this conclusion.

Tillett also claims that there is also a Bladderpod population "a couple miles

south from Mystery Cave," potentially in Burn Unit 13.  (Doc. 1-1 at 8.)  But

Tillett does not cite to any evidence in support of this claim, and the bare assertion

is insufficient to create a genuine issue of material fact without further

substantiation.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary

judgment motion cannot be defeated by relying solely on conclusory allegations

unsupported by factual data.").

The Court finds that BLM took the requisite hard look at the prescribed

burns' effects on the Lesica's Bladderpod.

### v.       Shoshone Carrot

The Revised EA recognizes that Shoshone Carrot is one of the "most

notable" special status plant species within the project.  (AR at 1017.)  While the

Revised EA contains information indicating that the Bladderpod will not be

affected by the prescribed burns, there is no such assurance with respect to the

Shoshone Carrot.  The extent of BLM's discussion surrounding the Shoshone

Carrot in the Revised EA explains that "[a]n inventory for the presence of

*Shoshonea pulvinata*, commonly called Shoshone carrot, would occur prior to burning. Existing known sites would be avoided or not have any soil removal during pre-treatment activities." (AR at 1017.)

This limited analysis does not comply with Judge Watters' directive to take a hard look at the prescribed burns' impact on special status species. Judge Watters has already determined that merely acknowledging that a sensitive species exists in the burn area, and promising to inventory the species prior to the burn, is not sufficient. *Tillett*, CV 14-73-BLG-SPW (D. Mont. Aug. 28, 2015 (Doc. 35 at 12-13)).

Moreover, the pledge to take mitigation measures where the plants are located does not bolster the sufficiency of the agency's analysis. NEPA requires that BLM analyze the burns' impact on the environment before it is approved, not after. In *Northern Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011), for example, a railroad company proposed to build a 130-mile railroad line in Southeastern Montana. The project was challenged by the plaintiffs on several grounds, including a claim that the project's impact on sensitive wildlife and plants had not been properly evaluated during the NEPA process. *Id.* at 1083. In general, the final EIS proposed that surveys of sensitive plants and wildlife would be conducted after approval of the project, and mitigation efforts would be implemented to minimize the impact of the project.

With respect to sensitive plants, for example, preapproval surveys had not been conducted to identify which protected species existed along the railroad's right-of-way. A mitigation measure was therefore included which proposed to conduct a field search to "identify plant species of concern (Federal and state) and to implement appropriate mitigation measures during construction activities if such species were found." *Id.* at 1084.

The Ninth Circuit held that deferring the gathering of such baseline data until after the NEPA approval process was improper. The Court held that NEPA required a determination of "the projected extent of the environmental harm to enumerated resources *before* a project is approved." *Id.* at 1084 (emphasis in original). The Court said that "[m]itigation measures may help alleviate impact *after* construction, but do not help to evaluate and understand the impact before construction." *Id.* at 1084 (emphasis in original).

The Ninth Circuit also pointed out that a deferred analysis of environmental impact until after approval is inconsistent with the core purposes of NEPA. "NEPA aims (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *Id.* at 1085. The Court said that the "use of mitigation measures as a proxy for baseline data does not further either purpose." *Id.* Without that data, the agency (1) "cannot carefully consider information about

significant environment impacts," and (2) even if data is to be "collected at some time in the future, the data is not available during the EIS process and is not available to the public for comment." *Id.*

The District Court for the District of Idaho reached the same conclusion in *Idaho Conservation League v. U.S. Forest Service*, 2016 WL 3814021 (D. Idaho 2016). That case involved a proposed mining exploration project in the Boise National Forest. Following approval of the project by the Forest Service, the plaintiffs brought suit under the APA alleging violations of NEPA. The plaintiffs maintained, among other things, that the Forest Service had failed to take the requisite hard look at the project's impact on the Sacajawea Bitterroot, a sensitive plant species which was prevalent in the Boise National Forest. The supplemental EA for the project recognized the existence of the plant in the project area, and also recognized that it could be impacted by the project. Similar to this case, however, the EA provided that the "impact would be avoided in many cases and, where avoidance is not possible, the impacts would be minimized to the Maximum Extent Practicable" by monitoring and mitigation measures. *Id.* at *8.

The plaintiffs argued that this approach violated NEPA because it did not sufficiently review the project's impact on the plant species. The plaintiffs also maintained that the Forest Service had not obtained recent data on the plant's population in the project area, particularly since a fire had recently burned in the

area. The Forest Service recognized the need for baseline data following the fire, but proposed to conduct this analysis during the project, and then proposed monitoring and mitigation to protect the Bitterroot. *Id.*

The Idaho District Court determined that the Forest Service's approach violated NEPA, finding it "puts the cart before the horse by prematurely asking for approval of the Project before the necessary baseline data and analysis are conducted." *Id.* at *10. Relying on the Ninth Circuit's decision in *Northern Plains*, the District Court concluded that "NEPA demands that the Forest Service analyze a project's impacts before it is approved; not as part of the Project itself." *Id.*

The Revised EA in this case shares the same defective process with respect to the Shoshone Carrot. It provides no baseline data on the existence or prevalence of the Shoshone Carrot in the project area, and defers this analysis until after approval of the project. It also provides no analysis of the possible impact of the prescribed burn, or how BLM may be able to mitigate any negative impact. For example, assuming BLM's pre-burn inventory does locate a Shoshone Carrot population in the burn area, there is no discussion in the Revised EA as to how BLM intends to "avoid" the plant, or any discussion as to how a lack of "soil removal during pre-treatment activities" will protect the plant from fire. *See Center for Biological Diversity v. Fed. Highway Admin.*, 290 F.Supp.2d 1175,

1187 (S.D. Cal. 2003) ("hard look" must include "a study and evaluation of reasonable range of alternatives to minimize or avoid" harmful effects) (citing *Ore. Nat. Res. Council v. Marsh*, 52 F.3d 1485, 1488 (9th Cir. 1995)). Furthermore, even assuming those efforts are effective, BLM still must discuss the prescribed burns' effects on the Shoshone Carrot and its habitat, together with scientific sources for its conclusions. *Earth Island Inst.*, 442 F.3d at 1160.

At a hearing on the present motions, however, Defendants pointed out that the Revised EA is tiered to a 2009 Pryor Mountain Wild Horse Range Environmental Assessment and Herd Management Area Plan ("HMAP"), and maintain that the HMAP provides the necessary baseline data for potential impacts of the burns on the Shoshone Carrot. But the HMAP again simply recognized the existence of the Shoshone Carrot ("*Shoshonea*") within the PMWHR, and acknowledged that it has been designated as a sensitive plant species by both BLM and the U.S. Forest Service. (AR at 903.) The HMAP also recognizes a study which "documents the relative stability of the species in a range of settings on two transects in the PMWHR." (AR at 904.) But aside from this limited discussion on the existence of the plant within the PMWHR, the HMAP only addresses the potential threat to the species from wild horses, and concludes that "[n]o direct evidence of grazing [on *Shoshonea*] was observed." But the conclusion that wild horses do not graze on the Shoshone Carrot tells very little, if anything, about the

31

impact of fire on the species. Therefore, the analysis in the HMAP regarding the impact of wild horse grazing in the PMWHR does not provide either sufficient baseline data, or any analysis of the impact of fire on this sensitive species.

For these reasons, the Court finds that BLM has failed to take the requisite hard look at the prescribed burns' effects on the Shoshone Carrot.

In sum, the Court finds that BLM took the requisite hard look with respect to the Clark's Nutcracker, the resident species of Bat, and Lesica's Bladderpod, and therefore recommends that Defendants' summary judgment motion (Doc. 25) be granted, and Tillett's summary judgment motion (Doc. 28) be denied, with respect to those species. The Court further finds that Defendants failed to take the requisite hard look with respect to the Peregrine Falcon and the Shoshone Carrot, and therefore recommends that Defendants' summary judgment motion (Doc. 25) be denied, and Tillett's summary judgment motion (Doc. 28) be granted, with respect to those species.

## V.      Conclusion

Based on the foregoing, **IT IS RECOMMENDED** that:

(1)      Defendants' Motion for Summary Judgment (Doc. 25) be **DENIED** and Tillett's Motion for Summary Judgement (Doc. 28) be **GRANTED** with respect to the Revised EA's discussion of the special status species Peregrine Falcon and Shoshone Carrot;

(2)     Defendants' Motion for Summary Judgment (Doc. 25) be

**GRANTED,** and Tillett's Motion for Summary Judgement (Doc. 28) be **DENIED**,

in all other respects;

(3)     Defendants' decisions regarding impacts on the special status species

Peregrine Falcon and Shoshone Carrot in the Revised Environmental Assessment

be **VACATED** and the matter be **REMANDED** to BLM for further proceedings

consistent herewith; and

(4)     Defendants' Motion to Strike Plaintiff's Statement of Undisputed

Facts (Doc. 34) be **DENIED** as moot.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy

of the Findings and Recommendation of United States Magistrate Judge upon the

parties.  The parties are advised that, pursuant to 28 U.S.C. § 636, any objections to

the findings and recommendations must be filed with the Clerk of Court, and

copies served on opposing counsel, within fourteen (14) days after entry hereof, or

objection is waived.

DATED this 5th day of December, 2017.


TIMOTHY J. CAVAN
United States Magistrate Judge